## COURT OF APPEALS.

### July 7, 1920.

## THE PEOPLE v. SAMUEL MICHALOW.

### (229 N. Y. 325.)

(1) MURDER—KILLING OF PERSON ROBBED—DEFENDANT INDUCING ROBBERY GUILTY OF MURDER ALTHOUGH NOT PRESENT WHEN CRIME WAS COMMITTED.

Where defendant induced and procured others to rob a certain person and, after the commission of the robbery, such person's death was caused by means taken by the robbers to effect their escape with their loot, before an alarm could be given, such act constituted murder in the first degree (Penal Law, § 1044) and the defendant was a principal therein, although he was not present when the robbery was committed. (Penal Law, § 2.)

(2) SAME—CLAIM THAT THE ROBBERY HAL BEEN COMPLETED AND THAT THE MURDER WAS SUBSEQUENT THERETO.

The claim of the defendant is that the object of the conspiracy had been accomplished, the robbery had been completed and the subsequent acts of two of the defendants were not connected with it, but were entirely independent and done to effect the escape of one or both, but the transaction was not ended, the criminals were not actually engaged in escaping from the scene of the crime. They were still on the premises. The robbery was not complete until, at least, the property was removed from the apartment. (People v. Marwig, 227 N. Y. 382, distinguished.)

(3) SAME—ERRONEOUS EXCLUSION OF EVIDENCE TENDING TO SHOW HOSTILITY TO DEFENDANT OF WITNESSES FOR PROSECUTION.

The hostility of a witness to a defendant indicted for a crime may be shown by any competent evidence and where a man summoned as a witness for defendant, but not sworn, overheard in an anteroom of the court room a conversation between witnesses for the prosecution which showed hostility to the defendant, and his testimony was offered to show this fact, it was error for the trial court to refuse to admit such testimony, upon the ground that it was not competent to show what was heard unless defendant first asked the witnesses who had the conversation whether they had made statements in conflict with their testimony and then they might be contradicted.

The error of excluding such testimony is not cured by the fact that defendant's counsel stated, "I accept the suggestion" of the court, and thereupon recalled and interrogated the witnesses for the prosecution who denied the conversation, and his own witness then testified to it,

one of the alleged conversations being finally excluded because the witness was not recalled and interrogated.

APPEAL from a judgment of the Supreme Court rendered January 13, 1920, at a Trial Term for the county of Westchester, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*Alexander A. Mayper,* for appellant.    The People failed to make a case against this defendant and upon the facts the indictment should be dismissed.    (People v. Marwig, 227 N. Y. 282; People v. Cohen, 223 N. Y. 406; People v. Zucker, 20 App. Div. 363, 154 N. Y. 770.)    The trial court erred in excluding testimony of bias, hostility and corruption.    (People v. Lustig, 206 N. Y. 162.)

*Lee Parsons Davis, District Attorney (Thomas A. McKennell,* of counsel), for respondent.    Givner was engaged in the commission of the felony of robbery at the time of the homicide. The property taken had not been carried away; and the killing, committed by Givner before he and Lipp left the premises where the robbery took place and for the purpose of preventing their identification and detection (which prevention would also conceal appellant's connection with the crime), was not an act occurring after the robbery was complete nor one unconnected therewith.    (People v. Giusto, 206 N. Y. 67; People v. Friedman, 205 N. Y. 161; People v. Wolter, 203 N. Y. 484; People v. Schermerhorn, 203 N. Y. 57; People v. Sullivan, 173 N. Y. 122; Cox v. People, 80 N. Y. 500; People v. Meyer, 162 N. Y. 357; Ruloff v. People, 45 N. Y. 213; Dolan v. People, 64 N. Y. 485; People v. Harrison, 227 N. Y. 647.)    Appellant, who was concerned in the commission of the robbery, aided and abetted in its commission and counseled, commanded, induced and procured Givner and Lipp to commit it, was a principal in the felony although absent at the time of its commission,

and, therefore, chargeable with the consequences of all the acts performed by Givner in the commission of that crime, including the killing of Mrs. Niznick by Givner in its commission; and this even though neither appellant nor Givner had any design to effect her death.    (People v. Bliven, 112 N. Y. 79; People v. McKane, 143 N. Y. 455; People v. Peckens, 153 N. Y. 576; People v. Mills, 178 N. Y. 274; People v. Patrick, 182 N. Y. 121; People v. Britton, 134 App. Div. 275; People v. Katz, 209 N. Y. 311; People v. Friedman, 205 N. Y. 161; State v. Davis, 87 N. C. 514; State v. Isaacs, 36 Tex. Cr. Rep. 505.)    There was no error in the rulings upon evidence. (People v. Seidenshner, 210 N. Y. 341.)

ANDREWS, J.:

Samuel Michalow is a Russian, fifty-seven years of age, who has been in this country for twenty-seven years.   He is engaged in the real estate business in a small way and has accumulated a few thousand dollars.    Some time in the spring of 1919 he became acquainted with a young Russian named Lipp who was employed in a butcher shop where the defendant dealt.

From the evidence produced by the People the jury might find that shortly after they met Michalow began to ask Lipp if he knew of any Italians who would help on a job, meaning by that a burglary or a robbery.    Lipp replied that he did not; but Michalow talked with him frequently on the subject.    At last he asked Lipp if he himself would do it.    He, Michalow, had a woman in Yonkers who was " leading him to a woman who had $3,500."   Lipp finally consented.

A man named Shadlidk, nicknamed " John the Painter," was a friend of Michalow.    They had done business together and they had discussed a niece of Shadlidk's named Anne Moscowitz who, Shadlidk had said, was a skillful thief.    She was also well known to Michalow.    She had lately moved to Yonkers and the woman to whom Michalow referred in his conversation with Lipp was evidently this Anne Moscowitz.

Early in September or late in August Michalow, Lipp and
Shadlidk went to Yonkers and to her house.    After some talk
she took them to a tenement in which, on the second floor, a
Mrs. Niznick lived in four rooms with a son and a boarder.
Michalow pointed out this house and gave some information
about it and about Mrs. Niznick to Lipp.    He told him among
other things that he, Michalow, would get two other men to
help in the robbery, and said that the three would bind and gag
Mrs. Niznick and get the money.

The next Saturday Lipp met Michalow outside a saloon and
Michalow introduced him to Cohen and Givner.    He told him
that these were the two boys of whom he had spoken and that
they were to go together to Yonkers and do the job.    The next
Monday the three men did go to Yonkers and to the house of
Mrs. Niznick.    In a factory across the way, however, there
was a strike and policemen were in the vicinity.    Therefore
the time was thought inopportune.    The three men went back
to New York and reported the facts to Michalow, and Cohen
told him and told the others that he would have nothing further
to do with the crime.    On receiving the report Michalow told
Lipp and Givner to go back after the strike was over.    The
two did go back on the 7th of October.    Givner knocked at the
door of Mrs. Niznick's apartment.    He then entered, leaving
Lipp outside.    Ten minutes later he came out saying to Lipp,
" All right, come in the house."    Lipp entered and found Mrs.
Niznick sitting in a chair in the front room. ·   Givner said,
" All right, I got the money," and then turning to Mrs. Niznick
said, " Stand up and walk in the bedroom."    Without resist-
ance or remonstrance she did so.    She also, without resistance,
upon Givner's command, laid down upon the bed face down-
ward.    Givner then bound her hands and feet with the help
of Lipp and gagged her.    An apron or skirt was pulled over
her head and Lipp was sent to the doorway to see if anybody
was coming.    Givner went into the kitchen and took a gas
tube.    He said :· " I am going to make her sleep for a while

until we will be safe down to New York because I've got my picture in the gallery." Lipp told him not to do so, but Givner replied, " Well, I want to be safe because I've got my picture in the gallery." The tube was then fastened, one end to a gas jet and the other leading to Mrs. Niznick's face through a hole or slit cut in the skirt. The gas was turned on and the two men left her. The result was the death of Mrs. Niznick.

The proceeds of the robbery was in Liberty bonds and cash amounting to something over $1,200. Givner seems to have carried it away with him but later he gave $600 of it to Lipp. Immediately afterwards he asked Lipp to return $15, saying that he was going to give Michalow $30. Lipp handed him the $15 and saw Givner go down into the cellar of the house where Michalow lived. He saw Michalow present in the cellar but did not see the money handed over. The hour of this transaction must have been about 5 o'clock on October 7th. Michalow later told him that Givner had fooled him as to the amount obtained by the crime. The next day Michalow handed Anne Moscowitz $40 and told her that " This is the Niznick money," and to keep quiet about the defendant's having been in Yonkers. On the 10th of October Michalow was arrested, and while under arrest he told Cohen to say nothing " on him." He also said that he did not know Lipp, Givner, Cohen or Anne Moscowitz.

Michalow denies this story entirely. If he and his witnesses are to be believed, he was innocent of any participation in the crime. He claims that the People's witnesses have conspired to convict him and to allow the actual murderers to escape.

The evidence is sufficient, however, to present a fair question of fact to the jury and we may not interfere with the result reached by it. But under the circumstances we must scrutinize with care the rulings of the trial court. Merely technical errors we may ignore. If, however, the substantial rights of the defendant have been affected, he is entitled to a new trial.

It is said that one who conspires with others to commit a

28

robbery but is not present at the transaction itself is not guilty of murder in the first degree, when one of the conspirators actually engaged in the robbery kills his victim accidentally or otherwise. " The killing of a human being  *  *  *  is murder in the first degree, when committed:  *  *  *  without a design to effect death, by a person engaged in the commission of, or in an attempt to commit a felony, either upon or affecting the person killed or otherwise." (Penal Code, § 1044.) " A person concerned in the commission of a crime, whether he directly commits the act constituting the offense or aids and abets in its commission, whether present or absent, and a person who directly or indirectly counsels, commands, induces or procures another to commit a crime, is a ' principal.' " (Penal Code, § 2.) Michalow, therefore, was a principal in the Niznick robbery. Was he " engaged " in its commission? Clearly we think he was. A " look-out " who does not enter the house is so engaged. That was the position of the defendant in People v. Usefof (227 N. Y. 622). The facts before us require one further step. But to say that a man, who induces or procures a crime, but who remains absent while it is being committed, is not engaged in it, while his tools are so engaged, would be a mockery. If so, it is immaterial whether one or all of the conspirators intended to use force, whether they were armed or unarmed, whether one or all were actually present when the murder was committed. The design to effect death is not an element of the crime. If in fact one did kill " while engaged in the commission of a felony," all are guilty of murder in the first degree.

The next claim of the defendant is that the object of the conspiracy had been accomplished, the robbery had been completed and the subsequent acts of Givner and Lipp were not connected with it, but were entirely independent and done to effect the escape of one or both, and he cites People v. Marwig (227 N. Y. 382). It must be conceded that prior to the assault on Mrs. Niznick, Givner had already obtained her prop-

erty, but the transaction was not ended, the criminals were not actually engaged in escaping from the scene of the crime. They were still on the premises. They were still busied in making safe the removal of their loot. Whether they already had the money in their pockets or were to take it up afterwards is immaterial. The robbery was not complete until, at least, it was removed from the apartment. Nothing that was decided in the Marwig case in any degree conflicts with this conclusion. (Dolan v. People, 64 N. Y. 485.)

We find, however, one error by which the rights of the defendant were prejudiced. The hostility of a witness to the defendant may be proved by any competent evidence. It may be shown by cross-examination of the witness, or witnesses may be called who can swear to facts from which it appears. It is not necessary to first examine the witness as to his hostility. (People v. Lustig, 206 N. Y. 162.) As we have seen here, the claim of the defendant was that the hostile witnesses had conspired to place the burden of the crime upon him. One of the most important of these witnesses was Anne Moscowitz. A man named Bogoc, while not sworn, was present for the defense and during the trial he with the other witnesses was kept in an anteroom adjoining the court room. At the close of the testimony he was called by the defendant. He said he had overheard a conversation between a woman, evidently Anne Moscowitz, and another of the People's witnesses. The court refused to allow him to give this conversation. He was asked if the woman had said anything to the witness about the testimony he had given and again no answer was permitted. The reply of the witness was also excluded. So was testimony as to whether the woman had said anything to the other witnesses and specifically whether she had inquired if they had given the same story they had talked about. The court then refused to allow further questioning along the same line. It said that the question was presented and rulings made—that it was not competent for Bogoc to testify as to what he heard other wit-

nesses say. The defendant must first ask the witnesses themselves whether they had made statements in conflict with their testimony and then he might contradict them.

That the testimony of Bogoc, if believed, was important, is clear. It is clear, also, that the ruling was erroneous. Obviously the object of the testimony was to show hostility and corruption on the part of the witnesses. It should have been received. Was the mistake cured by what subsequently occurred. In response to the ruling of the court, the counsel for the defendant, although he had taken exceptions, replied, "I accept the suggestion." He then called Moscowitz and two other witnesses and asked them as to the alleged conversation. All denied it. Bogoc was then recalled and was allowed to say that Mrs. Moscowitz described to one witness the appearance of the defendant, apparently before he had been asked to identify him, but the court refused to allow him to give a similar conversation with another witness because the question had not previously been put to him, but allowed him to state that she asked this witness if he had said " the same that she told him."

We do not think that these proceedings cured the error. If there was testimony that Mrs. Moscowitz was instructing witnesses as to the identity of the defendant, the jury was entitled to have it before them. It may not be true, yet that was a question for it to decide. As to one such alleged conversation all questions were finally excluded. As to the other conversations, finally admitted, the testimony lost much of its force by the requirement as to the form in which it was to be admitted. The defendant was compelled first to place before the jury a denial by hostile witnesses of his proposed testimony. Nor do we understand that it was the intention of his counsel to acquiesce to the adverse ruling. He wished to question his witness. He could not do so in the manner to which he was entitled. The best he could do was to accept the suggestion of the court. His freedom of action was unduly limited. And even at the end one proper question was excluded.

The judgment of conviction should be reversed and a new trial should. be granted.

HISCOCK, Ch. J., COLLIN, HOGAN, POUND, McLAUGHLIN and ELKUS, JJ., concur.

Judgment of conviction reversed, etc.