People of the State of Illinois, Plaintiff-Appellee, v.
Dembrus Golson, Defendant-Appellant.

Gen. No. 50,251.

First District, Fourth Division.

September 13, 1966.

1

Gerald W. Getty, Public Defender of Cook County, of Chicago (Marshall J. Hartman and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and George Samels, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE ENGLISH delivered the opinion of the court.

CHARGE
 Burglary.*

---

\* Ill Rev Stats (1961), ch 38.
§ 19–1. **Burglary**
(a) A person commits burglary when without authority he knowingly enters into, or without authority remains within a build-

JUDGMENT

After a trial without a jury, the court found defendant guilty and sentenced him to a term of twelve to fifteen years.

POINTS RAISED ON APPEAL

(1) The indictment was fatally defective.

(2) Defendant was not proved guilty beyond a reasonable doubt.

(3) The court erred in denying defendant's request to examine certain police reports.

EVIDENCE ON BEHALF OF THE STATE

*Sarah Dickerson*

When she left her apartment (1651 E. 67th Street, Chicago) at about 7:00 a. m. on June 5, 1963, she locked both front and back doors, and propped an iron bar against the back door. The drawers in the kitchen were closed. When she returned about 2:00 p. m. she found the glass in the back door broken, the bar removed from its place, and the kitchen drawers open.

*Carl Dickerson*

He was the fourteen-year-old son of Sarah. When he left for school at about 8:15 a. m. both front and back doors were locked. When he returned about noon he saw the front door wide open. He went into the kitchen and saw that the back door was also open, the glass was broken, and the iron bar, normally propped against the door, was lying on the floor between the living room and kitchen. He went into the living room and placed a phone call to inform his mother of the situation. While he was waiting for her to answer, he saw a man in a blue jersey and black leather cap standing in the doorway of

---

ing, . . . or any part thereof, with intent to commit therein a felony or theft.

. . .

3

the kitchen, a distance of six or ten feet from where he was standing. Carl was frightened. He dropped the phone and ran out the front door and down the street until he found a policeman and reported what he had seen. The policeman was walking with Carl back to his home but when the two arrived at the front courtway of the building Carl saw the man he had seen in the apartment 3 or 4 minutes earlier, and the policeman arrested him. The man was still wearing the blue jersey and black leather cap he had worn when Carl first saw him in the apartment. Carl identified defendant in open court as the man whom he had seen standing in the kitchen doorway.

*Nelson Mainor, a Police Officer*

At about 12:15 p. m. on June 5, 1963, he was cruising the neighborhood on an investigation when Carl Dickerson came up to him in an alley and they had a conversation. He thereupon followed young Dickerson to his address, observed defendant coming out of the courtway, and, on the boy's identification, placed defendant under arrest. A search of his person revealed a screwdriver in his pocket and there were specks of glass dust in his pants cuffs.

On cross-examination Mainor testified that Dickerson told him in the alley that a man had broken into his home and was still there. They had gone only twenty feet from where Dickerson first contacted him when they saw defendant coming out of the courtway. He was not on the street.

*Alex Wrubleski, a Police Detective*

He questioned defendant at the police station. Defendant denied entering the Dickerson apartment, claiming that he was at that address visiting a friend.

On cross-examination Wrubleski testified that Officer Mainor told him that young Dickerson had given him a description of the man alleged to have been in the apartment and that they made a search of the neighborhood

4

prior to the arrest. Wrubleski also had a conversation with the Dickerson boy.

EVIDENCE ON BEHALF OF DEFENDANT

*Dembrus Golson, defendant*

He had been with Willie Mae Turner, a landlady for whom he worked on occasion, until five or ten minutes past noon on the date of the occurrence. When he left her, he was walking east on 67th Street when a kid almost ran into him and a policeman arrested him. He denied that he ever came out of the courtway at the Dickerson address, but claimed that he was merely walking along the street at the time of the arrest.

*Willie Mae Turner*

Defendant worked occasionally as a maintenance man for her building which was located in the neighborhood of the Dickerson home. He carries a screw driver and other tools on his person for reasons connected with his maintenance job. Defendant had been with her from 10:00 a. m. until shortly after noon on June 5, 1963.

OPINION

 (1) In defendant's brief he contends that the indictment was fatally defective for describing the burglarized premises only as the dwelling house of Sarah Dickerson in Cook County, without specifying the street address. This point has since been decided adversely to defendant's argument. People v. Blanchett, 33 Ill2d 527, 212 NE2d 97; People v. Petropoulos, 59 Ill App2d 298, 208 NE2d 323 affirmed, 34 Ill2d 179, 214 NE2d 765.

 (2) We consider that the record contains ample evidence which, if believed, establishes defendant's guilt beyond a reasonable doubt. The credibility of the witnesses is essentially a matter for the trial court.

Defendant contends that the Dickerson boy's identification testimony must be discredited because he did not have sufficient opportunity to see defendant in the apart-

5

ment. We do not agree. In our opinion the evidence discloses adequate opportunity to observe.

■ (3) In the course of the trial defense counsel moved to be furnished with a copy of a statement allegedly given to the police by Carl Dickerson. His motion was not granted, and he now argues, on the basis of People v. Moses, 11 Ill2d 84, 142 NE2d 1, and other cases in that line, that this constitutes reversible error. We think not.

The stated objective of the motion was impeachment of the testimony of Dickerson as to what he had done between the time he ran out of the house and the time when defendant was arrested. The question first came up on cross-examination of Dickerson in this fashion:

| | |
|---|---|
| Defense Counsel: | Did you make a statement to the police or to the State's Attorney? |
| | · · · · · · |
| The Court: | . . . You can ask them if they have a statement. |
| Defense Counsel: | Can I have that statement, please? |
| State's Attorney: | There is no statement. |
| | · · · · · · |
| Defense Counsel: | Your Honor, at this time I am moving for a copy of that statement. |
| State's Attorney: | He did not make a statement. |
| The Court: | You haven't asked him that. |
| | · · · · · · |
| Defense Counsel: | Did you make a statement, an oral statement to the police? |
| Witness: | He was asking me questions about how I came from school and all that. |

6

Defense Counsel: Concerning about what happened after you saw the man in your house and what you did?

Witness: Yes, sir.

Defense Counsel: Did you ever sign that statement?

Witness: No, sir.

Defense Counsel: You just told it to him by way of mouth, is that correct?

Witness: Yes, sir.

. . . . . .

These excerpts from the record convince us that denial of defendant's request was not offensive to the principles developed in Moses. The sequel to Moses, People v. Wolff, 19 Ill2d 318, 167 NE2d 197, held that it is error for the trial judge to preclude defense counsel from asking questions for the purpose of proving the existence of the desired document. In the instant case, however, defense counsel was permitted to ask the Dickerson boy whether the latter had ever signed a written statement. The reply was in the negative. In addition, defense counsel was permitted to ask the State's Attorney whether there was a written statement by the Dickerson boy. Again, there was a negative response. We find here no undue restriction on cross-examination, the only suggestion of the existence of a written statement being found in the conjecture of defense counsel. We consider this case to be distinguishable from People v. Edmonds, 30 Ill2d 538, 198 NE2d 313, where there was limitation of examination to determine the existence of a statement, and People v. Wright, 30 Ill2d 519, 198 NE2d 316 and People v. Cole, 30 Ill2d 375, 196 NE2d 691, where the existence of a statement was undisputed. Rather, we consider it in accord with People v. Miller, (First Dist.,

7

Nos. 49965, 50145). See also Johnston v. United States, 260 F2d 345, cert den 360 US 935.

■ Later in the trial, during cross-examination of Officer Wrubleski, defense counsel was furnished with a copy of the police report which had been prepared by the witness. He offered a part, but not all, of the report in evidence, and when this was denied he withdrew the offer. At this point, defense counsel attempted to elicit specific testimony from Wrubleski as to something which young Dickerson might have stated to him on the date of the occurrence, again for the avowed purpose of impeaching Dickerson. The court correctly sustained objection to this questioning on the ground that there was no foundation in the record to establish this particular impeachment of Dickerson, and defense counsel was unable to satisfy the court that any such foundation could be furnished.

DECISION

The judgment and sentence of the Circuit Court are affirmed.

Affirmed.

DRUCKER, P. J. and McCORMICK, J., concur.